All right, we'll move now to case number four of the morning, Felton v. Bartow, appeal number 18-1954. We'll first hear from Ms. Sperling. May it please the Court, my name is Carrie Sperling and I represent Jeremiah Felton. Mr. Felton was convicted of intentional homicide based on a one-sided medical presentation establishing the cause of death as non-accidental, and on a jailhouse informant who penned the death on Mr. Felton. Trial counsel didn't challenge the medical evidence, and she didn't expose the informant's potential to profit from his testimony, nor the fact that that was hidden from the jury. So far these claims have failed as ineffective assistance at counsel claims, because no court below has assessed the cumulative errors of counsel in this case. Specifically, the Wisconsin Court of Appeals continued a pattern of misapplying the strictly analysis to both prejudice claims of Felton's individual ineffective assistance at counsel claims, but also completely failed to look at the errors cumulatively as Goodman v. Bertrand requires, and therefore, as Goodman says, it's contrary to and an unreasonable application of Strickland, and therefore, its decision is of no deference by this court under the AEDPA. In this case especially, a cumulative analysis is important. It's essential, because the two claims are inextricably intertwined. They rest on each other, they rely on each other, they cannot be separated. At trial, the state's experts claimed that the injuries that the infant suffered were from enormous forces, equivalent to a car accident or a multi-story fall. Their testimony said that this could not have been from an accident. In post-conviction, Mr. Felton's defense experts said that the physical evidence did not align with extreme forces. This was a minor accident, could have been consistent with a bump into a door, a short fall, and this was most likely the cause of the injuries. The state's experts and Mr. Felton's post-conviction experts provided starkly contrasting material opinions that were never heard by the jury. Mr. Felton's experts, the thrust of their testimony was the evidence supports the conclusion that this was an accident, whereas the state's But as strong as the state's unchallenged medical presentation was, there was still room to doubt in this case, and that's because the medical experts could not establish who did it. It still left room for several potential suspects, and that is at least until the because he gave a vivid description of an alleged confession, which we all know juries find one of the most compelling pieces of evidence of guilt. But his vivid picture painted this violent shaking and taking a four-month-old infant and swinging it by its legs into a baseball bat, but most importantly, the informant's vivid description aligned perfectly with the state's medical case. The informant's testimony and the unchallenged medical evidence became interlocking and then unassailable at that point. Now trial counsel knew this. She knew it would do this because before trial, when she found out the informant was going to testify, she asked for an adjournment to regroup, and she said at that point she realized just how critical a defense expert was to the case, but it was too late. She hadn't secured one. The prosecutor argued... Did the state court write anything about why they denied the continuance? No, there was no... No explanation to that. Well, to be fair, counsel didn't really explain at that adjournment the need for an expert. She was asking for an adjournment to deal with the informant, and the court said, you've got plenty of time to listen to the jailhouse tapes, you've got time to look at his record, which was extensive, and denied the adjournment. When did counsel become aware for the first time that there was going to be a jailhouse informant? Well, the record's not really clear. She had to have been aware that there was this informant because it was in the police reports. The detective had testified earlier in the case about where they had learned of this confession. It's not clear why she seemed surprised a week before trial when the state issued its witness list and the informant was on it, but she seemed surprised. But the prosecutor argued that this informant's testimony to the jury was devastating. The district court said it was very important, perhaps the most important piece of evidence in this case, to tie Mr. Felton to the death. And, of course, the informant had some credibility issues. He was a career informant. He had 10 convictions. He started out the case with credibility issues, and the state had a plan for that. The state's plan was to tell the jury, he's got no reason to testify in this case. There's nothing he can gain, absolutely nothing. He's coming to you just to do the right thing. There's no deal. He can get nothing for his testimony. But the jury did have some evidence before it, didn't it, that this guy was a Wheeler dealer? They did. Counsel tried to present some evidence that he had been operating with an attorney to get a deal. He had met with a detective. He had met with the prosecutors. But the prosecutors, in closing, completely denied that there was a deal, but they also denied that he could ever get anything, and this is the point. Counsel tried to point this out. She didn't object, but in her argument she said, he can go in and get a sentence modification. The prosecutor, again, comes back in rebuttal and says, he can't receive anything for his testimony at this point. And then again, he won't gain anything, just a lightening of his conscience. The crucial time is when this guy, House, testified, did he think he might get something out of it, right? Well, I think, I don't know that that's the relevant issue. The fact is he could get something, and the prosecutor hid that from the jury and hid these statements of the prosecutor, that he could never get anything for this testimony, were untempered, they were unrebutted, and they were the last words that the jury heard when they went to deliver Mr. Felton's fate, deliberate Mr. Felton's fate. But they were also a lie. Who brought to the jury's attention that House's lawyer had been dealing with the state representatives? Defense counsel brought in the audio tapes of him conversing with his counsel about a deal in this case, in a baby case. So the jury knew that? The jury heard that, but the critical thing is, in closing, in rebuttal, the prosecutor misrepresented that and said he could never get anything for this. And so that's the critical point, and I see I'm running into my, well, I'm sorry. Go ahead, please. But that's the critical thing, is that they were presented with evidence that maybe he was trying to work on a deal, he and the prosecutor both tell the jury there is no deal, there's no way there can be a deal, and there's no way he can go get any benefit from his testimony. This is just a lightening of his conscience. He's risking himself to come in and talk to you. But those false statements were the ones left with the jury as they go to deliberate Mr. Felton's fate. They were prosecutorial misconduct. They were unobjected to, and they were the last word. Was any instruction given to the jury about the arguments of counsel and how they should warrant evidence and warrant statements of the law that the judge was going to give? Did the judge say anything about this? Not specifically, and not in response to this argument, and besides that. In his general instructions to the jury, did the judge say, I'm giving you the law and nobody else in this room? Did the judge say anything about counsel's argument being just argument and not being a statement of fact? Sure, but they gave the typical instructions. He did give that instruction? Gave the typical instructions, but what the jury heard was from the prosecutor saying there is no way this informant can get anything. Those are the last words they hear on the informant, and it was false. We'll be giving you a brief rebuttal. Thank you, Ms. Sperling. Next we'll hear from Mr. O'Brien. May it please the court. The district court correctly held that Mr. Felton failed to prove that no fair-minded jurist could agree that the Wisconsin Court of Appeals reasonably applied Strickland v. Washington to the facts of this case when it held that Mr. Felton failed to prove prejudice with respect to either of his two challenges. The district court was correct because jail informant House, his credibility was significantly challenged by defense counsel. Defense counsel brought out that he has a reputation as a jailhouse snitch, that he has nine to ten prior convictions, that he tried to negotiate a deal, but unsuccessfully, both personally and through his lawyer in this case. This was all brought out. The problem here, and I think counsel is absolutely correct, his testimony did clearly align with the medical evidence, but that doesn't favor Mr. Felton's position. That proves the lack of reasonable probability of a different outcome had the jury been told, in addition to all of the attacks that counsel made on his credibility, that, oh yes, he could also somewhere down the road seek sentence modification for his cooperation in this case. And counsel, in fact, did point that out in her own closing argument. So the argument here is not that counsel failed to point it out. It's that counsel failed to re-point it out with an objection to the prosecutor's rebuttal argument. Counsel said she strategically chose not to object because A, she had already laid it out, and B, she didn't want to really get into a side issue on when people can move for sentence modification and why. She felt she had adequately made the point. And I don't think it's unreasonable for the Court of Appeals to agree with that, and the district judge found that that was not unreasonable. And again, please look at what Mr. House said. This was not the typical jailhouse snitch who said, oh yeah, I was a cellmate with this guy and he told me he committed the murder, period. His account is so detailed, it corroborates Mr. Felton's statement to the police in large part. Mr. Felton told the police, he waited seven days to tell the police this, but on June 9th, seven days after the murder, he told police that, oh yeah, I was bathing little J.J. in the tub at about 2 o'clock that afternoon and he slipped between my legs and bumped his head on the tub. And that's exactly what he told Mr. House. However, and he told Mr. House that J.J. got soap in his eyes when he slipped and fell in the tub and was crying uncontrollably, and then he added the detail to Mr. House that he didn't add in his statement to the police that, I got so frustrated with his crying, I picked him up and slammed him into the door. And that statement is not, he didn't stop there. He told Mr. House that, and House must have added, where did you hit him? In the right side of the skull, just above the ear, which is exactly what the medical findings are. So House's testimony both corroborates the medical evidence and is corroborated by the medical evidence. So it is significant, it is important, but that doesn't, again, help Mr. Felton's case because it shows the lack of a reasonable probability that the jury had counsel objected and say, I repeat, he can get a sentence modification motion if he wants somewhere down the road, that that would have changed the jury's view of Mr. House's credibility and would have caused the jury to disbelieve him and not be able to determine whether Mr. Felton was the one who killed J.J. or one of the other people who briefly had contact with him during that day. Did anything come out about why he went to House in the first place? No. I mean, obviously they were in the jail together. The only thing I can think of is House sent this note to the police, they call it a kite, I think I mentioned in the brief, to police on June 13th, which was 11 days after the murder. Felton's case was referred to the district attorney by police the day before, after the investigation had gone significantly enough to charge him. So he was charged June 12th. I presume Mr. Felton was aware that the case had been sent to the district attorney and that might have spurred a conversation between the two, like, well, what are you in here for? They're charging you with murder. What did you do? And then Mr. House claimed in his testimony that he was so incensed because he himself has a child or children that he was incensed that someone would pick up an infant, slam him against the wall, and that, House claimed, was his motivation for testifying. And I will point out that the prosecutor in his opening argument did argue that, to the jury, regardless of Mr. House's motivation, whether it's out of the goodness of his heart or whether he wants charges reduced or sentences reduced, the important point is Mr. Felton said this to him, and it's up to you to decide whether to believe it, whether it's the truth. So this issue was laid out significantly for the jury, and, yes, the jury is instructed that the arguments of counsel are not evidence. You are to decide the case based on the facts and the law presented before you. And so, again, we're talking about reasonable probabilities here. Was it reasonable for the state court, and, again, we give great deference to the state court's probable cause, to the no prejudice determination under Strickland. Was it reasonable, reasonably probable, that the outcome would have changed had counsel objected to the rebuttal argument? And it's our position that, no, it's not reasonably probable, or at least a fair-minded jurist could agree with the state court that it is not reasonably probable the outcome would have changed had counsel objected and said, as I said before, he can seek sentence modification. And, you know, another point I would add is when, you know, there's two things. One, had he not sought or had not received sentence modification, I think the argument would be less colored here. I think in hindsight, which we don't do in Strickland, but in hindsight, yes, he did apply for sentence modification four months after trial and got a significant reduction of his 30-month sentence. However, what's interesting is, and I think I've discussed this in my brief, the judge who granted modification, and the state stood silent because the state took no position. And I want to make one point real clear right here. There never was any secret deal that, hey, move for sentence modification and we'll stand silent until the judge will grant it. There was no secret deal. And that was conceded by Felton and his attorneys in the state court, that there were no secret deals, there were no promises. So this was done on Felton's own to seek sentence modification. The state took no part in it. That's entirely up to the discretion of the trial court whether to grant modification. And the state stood silent, took no part in the motion, just was present in court. And when the judge granted modification, he made a point of saying, I'm modifying your sentence, Mr. House, because I'm so impressed that you came forth with this significant information without having received any promises, without any deals, knowing that the state couldn't give you anything or wouldn't give you anything in exchange for your testimony, and yet you came out and provided the significant testimony in this case. Therefore, I am going to modify your sentence. You know, I can understand that discussion, but I guess to go back to my origin point is that he went to House for some reason, and I guess it's because this guy, maybe he was a jailhouse lawyer and maybe he was getting advice of what to do. Actually, that's a good point, and you jogged my memory on that, and I think I do point that out in my brief. Felton wanted to consult the jailhouse. Yes, House not only had the reputation of being a jailhouse snitch, which maybe Felton didn't know at the time, and it's too bad for him, but he did know that he had the reputation of being a jailhouse lawyer. And sure, that is correct. And that he then presumably went to him for legal advice because, again, he was charged. The case was officially referred to the DA the day before, and he might have said, God, I need help now. They're charging me with murder. You're a de facto lawyer in this place. Please help me. And so that is correct, and I'm glad you caught that, Your Honor. Well, it's because both the Court of Appeals and then the district court said this is probably the most important thing in this case. I don't necessarily agree with that. It's the most important, but it's important, and, again, because not only does it corroborate the medical evidence, it is corroborated by the medical evidence. So, yeah, they're intertwined, but they're both significant. The significance is in the detail of House's testimony, which, again, because that has inherent credibility despite all of his credibility flaws. I see my red light is on, so thank you. Thank you, Mr. O'Brien. Ms. Sperling, we'll give you a minute in rebuttal. The State's argument requires you to rely on the credibility of the prosecutor and rely on the credibility of a longtime informant. And there should be no deference here. The prosecutor misled the jury several times during the closing argument that there was no possibility of a benefit. It calls into question the entire trial, the integrity of the trial here. But at the same time, here we have cumulative error analysis that's never been done. De novo reviews required. And these two pieces of evidence were essential, the medical case and the informant. They can't stand alone. The medical case doesn't say who did it, and the informant cannot get this evidence in unless it's corroborated by something. And here it's only corroborated by the medical evidence, and the two can't stand alone. They come together and they form an inseparable link. Thank you, Ms. Sperling. Thank you, Mr. O'Brien. The case will be taken under advisement.